IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| STACEY M. SWAFFORD ) | |
| ) | |
| v. ) | No. 2:09-0104 |
| ) | Judge Wiseman/Bryant |
| SOCIAL SECURITY ADMINISTRATION ) | |

To: The Honorable Thomas A. Wiseman, Jr., Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration"), through its Commissioner, denying plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits, as provided under Titles II and XVI of the Social Security Act ("the Act"). The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 15), to which defendant has responded (Docket Entry No. 19). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 13),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this Report.

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

## I. Introduction

Plaintiff protectively filed her DIB and SSI applications in September 2006, alleging disability beginning in July 2002. These applications for benefits were denied at the initial and reconsideration stages of agency review, whereupon plaintiff requested a de novo hearing before an Administrative Law Judge ("ALJ"). An ALJ hearing was held on April 17, 2009, when plaintiff appeared with counsel and gave testimony. Testimony was also received from an impartial vocational expert. (Tr. 22-37) At the conclusion of the hearing, the ALJ took the matter under advisement until June 19, 2009, when he issued a written decision finding plaintiff not disabled and denying her applications for benefits. (Tr. 13-21) The ALJ's decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

2. The claimant has not engaged in substantial gainful activity since October 27, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: disorders of the lumbar spine and hip and depression (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently. She can walk/stand 2-4 hours, sit 6-8 hours in an eight hour day with normal breaks. The claimant has mild pain and mild to moderate loss of concentration. The claimant can understand and remember simple and low level detailed tasks. She can sustain concentration and persistence for tasks despite periods of increased symptoms. The claimant can interact appropriately with the public, supervisors, and

coworkers. She can set limited goals and adapt to infrequent change. She will have some, but not substantial difficulty recognizing hazards.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 8, 1968 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 27, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-17, 19-21)

On September 2, 2009, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-4), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II.  Review of the Record

Plaintiff injured her lower back in 2001, and received conservative treatment for a few months.  An MRI of the lumbar spine was taken on May 20, 2002, and showed annular tears at L4-5 and central disc herniations at L4-5 and L5-S1.  (Tr. 379)  Fusion surgery was performed, with the placement of intrapedicular screws from L4 to S1 bilaterally.  Plaintiff apparently did well for a period of time upon recovering from her surgery.

On March 8, 2004, plaintiff was seen in consultation by neurologist Robert S. Davis, M.D., upon referral from her primary care physician, Dr. Jonathan D. Allred.  Dr. Davis noted that plaintiff was positive for numbness, tingling and weakness in the left hand and right lower extremity, and that she displayed absent right ankle jerk and diminished pinprick sensation in the left median nerve distribution.  (Tr. 522)  He reviewed results from recent EMG/NCV studies which revealed left carpal tunnel syndrome, and diagnosed plaintiff with left carpal tunnel syndrome and right lower extremity lumbar radiculopathy. Id.  Dr. Davis prescribed the narcotic pain mediation Percocet, and instructed plaintiff to return to care in one month.  Id.  At the one month followup visit, Dr. Davis continued his prescription of Percocet and instructed plaintiff that she needed annual x-rays of her lumbar instrumentation.  (Tr. 523)

The day after her first visit to Dr. Davis, plaintiff was seen at the Spectrum Pain Clinic, where lumbar muscle spasms and paraspinal tenderness were observed, as well as antalgic gait, reduced lumbar range of motion, loss of reflex in the right Achilles tendon, and loss of sensation in the right foot.  (Tr. 430)  Tendon origin injections and trigger point injections were administered.  (Tr. 428-29)

A lumbar MRI taken on November 12, 2004 showed plaintiff's residual pedicle screws at L4, L5, and S1. Metallic artifact from these screws obscured the images at those levels, but no central canal stenosis was apparent at any level. (Tr. 368) There was no neural foraminal stenosis at any level that could be visualized, and no significantly bulging or herniated discs were noted. Id.

Plaintiff returned to Dr. Davis in December 2006 with continuing complaints of low back pain with radiation into both hips and thighs. Dr. Davis found bilateral lower spinal and paraspinal tenderness and hypethesia to pinprick bilaterally over the legs. (Tr. 524-25) He diagnosed lumbago and lumbosacral neuritis (not otherwise specified), ordered new film studies, and instructed plaintiff to continue pain management with Dr. Allred. Id. On December 15, 2006, the MRI ordered by Dr. Davis revealed circumferential disc bulge at the L3-4 level, and decreased signal surrounding the thecal sac at the L4-5 and L5-S1 levels thought to represent post-operative scar tissue encasing the thecal sac and nerve roots bilaterally. (Tr. 526) X-rays that same day revealed that the bilateral pedicle screws at the S1 level were broken. (Tr. 527) This finding was confirmed by lumbar myelography and a CT scan taken in January 2007. (Tr. 529, 570) The final note in the record from Dr. Davis reflects plaintiff's continued complaints of mechanical lower back pain and radicular left lower extremity pain, as well as tenderness along the left posterior iliac crest region. Dr. Davis had no further treatment recommendations, as plaintiff was not a surgical candidate, and released her to return to Dr. Allred for continued symptom management with medications, as well as possibly a referral to a pain clinic for trigger point injections. (Tr. 530) Dr. Allred treated plaintiff's pain and other symptoms with continued prescriptions of narcotic and other medications for the majority of the period at issue in this case.

Plaintiff was seen by Dr. Jerry Lee Surber on February 10, 2007, for a consultative examination at government expense. (Tr. 462-66) Dr. Surber was not provided any medical records for review prior to the examination, but did review lumbar x-ray reports which plaintiff brought with her to the examination. Dr. Surber noted that plaintiff "appeared weaker when standing on her left compared to her right leg and had limping antalgic gait toward the left which she attributes to that pain in her left lower back which radiates down the posterior aspect of her left leg." (Tr. 465) However, Dr. Surber's neurological examination was normal, and his musculoskeletal examination was largely normal. (Tr. 464) Dr. Surber concluded, based on his examination and without the benefit of prior medical record review, that plaintiff could be expected to perform a range of light work wherein she could stand or walk with normal breaks for up to two to four hours in an eight-hour workday, or sit with normal breaks for up to six to eight hours. (Tr. 465-66)

In 2008, plaintiff began treatment with Dr. Harold M. Lowe at Rural Health Clinic of the Cumberlands. On March 20, 2008, Dr. Lowe noted that plaintiff had tenderness over the lower left sacroiliac region "where the broken screw is located," and that she did have L4-5 nerve root symptoms. (Tr. 568) He prescribed hydrocodone. In April 2008, Dr. Lowe increased the dosage of hydrocodone in response to plaintiff's complaint of increased pain. (Tr. 567) In October 2008, plaintiff complained of nausea and poor pain relief with the hydrocodone, and Dr. Lowe switched her narcotic prescription to Percocet. In December 2008, he administered injections to the sacroiliac area of her back, bilaterally, and also to a region of her neck where she had new pain complaints. (Tr. 566) In March 2009, Dr. Lowe completed a medical source statement of plaintiff's ability to do work-related activities, indicating that she was only capable of minimal activity, as any vigorous activity would

6

aggravate her pain to unbearable levels. (Tr. 571-74)  With this medical source statement,

Dr. Lowe also submitted a letter which states as follows:

> This woman has been our patient for the past year. This letter is to confirm her total and permanent disability.
>
> Her problem was ... herniated lumbar discs initially treated with surgery which included internal fixation. She was then pain free for 2 yrs. The pain recurred and it was discovered that two of the screws used in fixation had broken. Her disabling pain is in the location of the broken screws. Her neurosurgeon believes that an attempt to remove them could only make things worse.
>
> At this point, she requires assistance to even get out of bed in the morning. Pain is her constant companion and is worsened by minimal activity, as well as sitting or standing or walking for more than a few minutes. There is no malingering here. She is a genuine and honest person in my opinion. One needs only to see her imaging studies and to examine her to know the severity of the problem.
>
> I believe her disability is complete and stable with a duration predicted to be many years. It is believed that any further surgery is of no value and likely to worsen the problem.

(Tr. 575-76)

Plaintiff received intermittent treatment for a depressive disorder in 2006 and 2007, from Plateau Mental Health Center. (Tr. 443-55, 506-17)  On February 19, 2007, she reported for a consultative psychological examination with Mr. Stephen Hardison, who diagnosed depressive disorder NOS, amphetamine dependence in full sustained remission, and opioid dependence in full sustained remission.[2]  Mr. Hardison assessed no more than mild functional limitations resulting from these conditions. (Tr. 474-78)

---

[2]Plaintiff reportedly spent about eight months during 2005 in jail on drug-related charges. (Tr. 25-26, 475)

At plaintiff's hearing before the ALJ, she testified to experiencing pain that radiates from her lower back into her left leg, as well as problems with her right hip. She takes narcotic pain medication three times per day, as well as Phenergan to control the side effect of nausea. She rated her pain as a 7 on a 10-point scale after she took her Percocet. She further testified that this medication affected her reflexes, but no longer made her drowsy. She testified that her pain limited her ability to lift more weight than a gallon of milk, to walk further than "across the road," to stand for longer than four minutes, and to sit for longer than thirty minutes. She uses a chair in the shower. She testified that her mother cooked meals for her and did the household chores. She testified that she spends a considerable amount of time each day lying down with a heating pad, and that she does not leave the house often. She has trouble sleeping and problems with her memory. In early 2009, Dr. Lowe prescribed her a quad cane to assist in walking. She testified to having had successful carpal tunnel release surgery on her right hand, but that she had not had surgery on her left hand, and had intermittent numbness or tingling in that hand. (Tr. 24-33)

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th

Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

## B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be

9

considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erred in failing to give good reasons for rejecting the opinion of her treating physician, Dr. Lowe, and that he likewise erred in adopting instead the opinions of the one-time, consultative examiners hired by the government.

Addressing first plaintiff's secondary argument related to her mental impairment, the undersigned finds no error in the ALJ's finding of only mild functional limitations resulting from plaintiff's depressive disorder. Greater limitations are not supported in the limited notes from plaintiff's mental health providers, nor in the assessment of the consultative psychological examiner. Furthermore, although her providers at Plateau Mental Health Center assigned a score of 45 on the Global Assessment of Functioning scale, this court has held that such scores are of very limited utility in the disability analysis, unless supported by some particular assessment of corresponding functional limitations. Smith v. Astrue, 565 F.Supp.2d 918, 925 (M.D. Tenn. 2008). See also, e.g., Kennedy v. Astrue, 247 Fed.Appx. 761, 766 (6th Cir. Sept. 7, 2007). Accordingly, plaintiff's mental impairment was properly considered by the ALJ.

As to plaintiff's primary contention regarding her level of physical impairment, in a letter dated March 31, 2009, Dr. Lowe opined that plaintiff was totally and permanently disabled by residual pain from the failed surgical treatment of her lumbar disc herniations, and that further surgery would be of no value, but would likely worsen the problem. (Tr. 575-76) A treating source opinion is entitled to controlling weight pursuant to 20 C.F.R. § 404.1527(d)(2) if it is well supported by objective, clinical evidence and not substantially opposed on the record. Even where such an opinion is not entitled to controlling weight, the Sixth Circuit has stated that "in all cases there remains a

presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference. . . ." Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 242 (6th Cir. 2007). Accordingly, ALJs must provide "good reasons" for discounting the weight of a treating source opinion. See 20 C.F.R §§ 404.1527(d)(2), 416.927(d)(2); Rogers, 486 F.3d at 242 ("[T]he ALJ must provide 'good reasons' for discounting treating physicians' opinions, reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'") (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5). The Sixth Circuit has described this regulatory requirement as an "important procedural safeguard" that the agency cannot disregard in an *ad hoc* fashion. Bowen v. Comm'r of Soc. Sec., 478 F.3d 742, 747 (6th Cir. 2007) (quoting Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004)).

In rejecting Dr. Lowe's opinion, the ALJ offered the following rationale:

> Little weight is given to Dr. Harold Lowe's letter and medical source statement of March 31, 2009 indicating the claimant is disabled. Dr. Lowe's opinion appears overly sympathetic to the claimant's subjective complaints. She was last seen by Dr. Lowe in September 2008, and, at that time her medication dosages and treatment were not changed. There is no letter from the claimant's neurosurgeon, Dr. Davis, indicating similar limitations.

(Tr. 18) The undersigned finds that the ALJ's rejection of the opinion letter of Dr. Lowe based on the absence of a similar letter from Dr. Davis is not reasonable. Dr. Davis did not perform plaintiff's 2002 lumbar fusion surgery, but saw her in consultation after she complained of the reoccurrence of radicular pain in early 2004. Plaintiff's surgery had evidently succeeded in resolving her symptoms until that time, but the record reveals that in March 2004, plaintiff was seen at the Spectrum Pain Clinic, where she was assessed with

12

radiculopathy producing antalgic gait, intractable pain, and requiring injections for symptom relief. (Tr. 428-30) She saw Dr. Davis for the first time in this same month, and after taking films and conducting his initial examination, Dr. Davis made neurological findings consistent with radicular pain, but found no surgical lesion. (Tr. 522-23) After his first followup visit with plaintiff, Dr. Davis did not prescribe medications for the management of plaintiff's symptoms, but referred her to her primary care physician (Dr. Allred) and/or pain clinic for symptom management. Dr. Davis continued to see plaintiff in neurological consultation with Dr. Allred until February 2007, when Dr. Davis had no further treatment recommendations, but returned plaintiff to Dr. Allred for general symptom management and to pursue her activities as tolerated, while also discussing the option of referral to a pain clinic for further trigger point injections. (Tr. 530) In short, Dr. Davis's limited treatment of plaintiff was addressed to her neurological complaints and the assessment of her candidacy for a *repeat* surgical procedure; he was not consulted on plaintiff's symptomatic treatment. It is thus not surprising that no assessment of work-related limitations was pursued from Dr. Davis, even though his findings and initial prescriptions of narcotic medication are not inconsistent with the level of pain credited by Dr. Lowe.

    As to the other reason given for discounting Dr. Lowe's March 2009 opinions -- that he had not changed plaintiff's medications from her last appointment in September 2008 -- it is not clear what bearing this might have on the analysis. In fact, Dr. Lowe's treatment notes reflect his last appointment with plaintiff in December, not September, of 2008 (Tr. 566), and after having increased plaintiff's narcotic dosage in July, he did order a change in medication in September, from Hydrocodone to Percocet, based on plaintiff's

13

complaint of poor pain relief with the former medication. Again, the undersigned finds no merit in this purported reason for discounting Dr. Lowe's opinion.

The failure to give good reasons for rejecting a treating physician's opinion is not generally subject to harmless error review, nor would such review yield grounds for the court to affirm the ALJ's findings in this case. The ALJ's review of the longitudinal medical record is as follows:

> Treatment notes show history of a lumbar fusion in 2002. On November 15, 2004, magnetic resonance imaging (MRI) of the lumbar spine did not show any evidence of central canal stenosis or neural foraminal stenosis at any level. There were no significantly bulging or herniated discs noted. Dr. Robert Davis, a neurosurgeon, indicated on January 8, 2007 that the claimant's surgical screws were fractured, but not unstable. Conservative treatment was recommended.

(Tr. 18) However, the referenced 2004 MRI report states as follows, in full:

> The patient has bilateral pedicle screws at L4, L5, and [S]1. Intervertebral disc spaces are well maintained. Alignment appears to be anatomic. There is no significant subluxation or dislocation noted. There is a fair amount of metallic artifact from the bilateral pedicle screws somewhat obscuring anatomic detail. There is no central canal stenosis noted at any level. There is no neural foraminal stenosis at the levels which can be adequately visualized. Signal from the L1-2, L 2-3, and L 3-4 discs is normal. L 4-5 and L5-S1 discs are harder to see. Again that appears to be primarily due to artifact. There may be a caged device in the L 4-5 intervertebral disc space.

(Tr. 241) It thus appears from this MRI that, contrary to the ALJ's finding of no stenosis at any level, the instrumentation in the lower levels of plaintiff's lumbar spine makes it difficult to see, and impossible to rule out, nerve root compression at those levels. Such pathology appears to be confirmed by the subsequent MRI of December 15, 2006, not referenced by the

14

ALJ, in which images were obtained with and without contrast revealing multilevel disease. (Tr. 526) Specifically, at the L3-4 level circumferential disc bulge is noted; at the L4-5 level, "Decreased signal is noted surrounding the thecal sac. On the pre contrast T1, this shows contrast enhancement and is thought to represent post operative scarring [encasing] the origins of the L5 nerve roots bilaterally"; and, at the L5-S1 level, "Low signal is noted surrounding the thecal sac and surrounding the origins of the S1 nerve roots bilaterally. This area shows contrast enhancement and is thought to represent post operative scarring encasing the thecal sac [and] the origins of the S1 nerve roots bilaterally." Id. These findings and conclusions appear to be consistent with the distribution of pain and other symptoms from the lower back to the legs and feet, consistently reported by plaintiff. (E.g., Tr. 462, 464) The consultative examiner, Dr. Surber, was not provided these MRI reports or any medical history (save for one x-ray report provided by plaintiff) to review. Yet even with the disclaimer that his opinion was not informed by plaintiff's medical records, Dr. Surber assessed plaintiff as limited by her pain to a range of light work based on the results of his examination, which included pain and weakness in plaintiff's left leg causing a limping, antalgic gait. (Tr. 465-66) Meanwhile, in support of his unequivocal assessment of plaintiff's disabling level of pain, Dr. Lowe offered that "[o]ne needs only to see her imaging studies and to examine her to know the severity of the problem." (Tr. 576) Plaintiff's treating physicians agree that she is not a candidate for repeat back surgery, but do not question her report of lower back and leg pain,[3] which has consistently required treatment with narcotic

---

[3]The government in its brief argues that "Dr. Davis opined that 'there are no clearly identified precipitating factors for the pain'" and that "this opinion is in direct opposition to the opinion of Dr. Lowe, who linked the alleged pain to the two fractured fusion screws." (Docket Entry No. 19 at 9) However, the statement in Dr. Davis's referenced note regarding precipitating factors is not an

15

medicines as well as occasional trigger point injections. In short, the record plainly does not provide such support for the ALJ's decision as to excuse his failure to give good reasons for rejecting Dr. Lowe's opinion, or to bolster his finding that plaintiff only experienced mild pain (Tr. 17).

In terms of plaintiff's credibility, the ALJ relied on a report of daily activities given to the consultative psychological examiner, which is inconsistent with the other reports of record. The consultative psychological examiner recounted plaintiff's report of daily activities as follows:

> She usually sleeps until 10:00 a.m. She will drink cups of coffee and then her sister will usually come and get her, and she goes to her house. She will help her sister with chores and also does some chores there at her parents' home where she is living now. She will do laundry and dishes. She goes grocery shopping with her sister. She used to enjoy going to shops and looking around with her sister but now [her sister] works too many hours for that. She will look after her sister's children some. She likes to be outdoors and work in flowers some. She has a dog as a pet. She does not drive but does have a license. She reported it makes her too nervous to drive. She has no regular community activities. She does [sew] as a hobby. She watches a great deal of TV. She [reportedly] does have some better days where she may go outside more and work with flowers or maybe talk with her family more. This may be one or two days out of the week.

(Tr. 476) In other reports, and in her hearing testimony, plaintiff related that her activities were severely restricted because of her pain, and that she relied upon her sister and mother to do her shopping and any household chores. (Tr. 29, 135, 139-42; but cf. Tr. 443, 460

---

opinion questioning the origin of plaintiff's pain, but merely a reflection of plaintiff's own report of her symptoms under the "history of present illness" section of the treatment note. (Tr. 524) This note (diagnosing lumbosacral neuritis) and others recognize the neurological component of plaintiff's pain, whether resulting from the broken pedicle screws themselves or from scar tissue.

(reports of therapist that plaintiff enjoyed working on antique furniture when she was not dealing with depression))  It is the province of the ALJ to resolve such inconsistencies in the evidence, and his credibility finding is not to be second guessed by this court.  However, in view of the fact that the report of activities credited by the ALJ was recorded by the one-time consulting examiner, and is contrary to the activity level attributed to plaintiff by her treating physician, Dr. Lowe (Tr. 575), the undersigned finds that it too is insufficient to render harmless the failure to give good reasons for rejecting Dr. Lowe's opinion.

The undersigned concludes that this case should be remanded to the SSA for further administrative proceedings, including updating the medical record and further consideration of Dr. Lowe's opinion.

## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this Report.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985);

Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 8th day of December, 2010.

        s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE